LOYOLA UNIVERSITY OF CHICAGO,
Plaintiff–Appellant,

v.

HUMANA INSURANCE COMPANY,
Defendant–Appellee.

No. 92–2417.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 5, 1993.

Decided June 14, 1993.

Paula M. Carstensen, John J. Reidy, Charles E. Reiter, III (argued), Ruff, Weidenaar & Reidy, Leon S. Conlon, Lundblad & Conlon, Chicago, IL, for plaintiff-appellant.

Robert J. Bates, Jr. (argued), Patrick M. Ouimet, Pope & John, Chicago, IL, for defendant-appellee.

Before BAUER, Chief Circuit Judge, MANION, Circuit Judge, and EVANS, Chief District Judge.*

TERENCE T. EVANS, Chief District Judge.

Forty-four-year-old Billy Via was a qualified participant under a group health plan provided by defendant Humana Insurance Company. On July 9, 1988, Mr. Via experienced chest pains and was admitted to Holy Family Hospital, where he was diagnosed with acute anterior wall myocardial infarction. On July 29, 1988, Mr. Via was transferred, with an intra-aortic balloon in place, to Loyola University Medical Center for cor-

---

* Terence T. Evans, Chief Judge of the United States District Court for the Eastern District of Wisconsin, is sitting by designation.

onary artery bypass surgery. Before undergoing the surgery, Mr. Via assigned his benefits under the health plan to Loyola. On August 2, after finding medical necessity, Humana authorized Mr. Via's admission to Loyola and 7 days of care.

Mr. Via underwent the surgery on August 3, but could not be weaned from the cardiac bypass machine. The surgeon, Dr. Henry Sullivan, had two choices: let Mr. Via die on the operating table or insert a Jarvik–7 total artificial heart to prolong his life until a heart donor could be located. The surgeon, of course, implanted the Jarvik–7. On September 5, when a compatible human heart became available, Mr. Via was given a heart transplant. He survived only 2 weeks with the replacement human heart, however, and died on September 19, 1988.

Humana originally denied all coverage for Mr. Via's hospitalization at Loyola. On December 28, 1988, Dr. Ronald Lankford, vice-president of medical affairs at Humana, notified Loyola that coverage for the Jarvik implant, the heart transplant, and related expenses was denied. Dr. Lankford's letter stated that Humana would not cover the implantation of the Jarvik heart because it was experimental and that in regard to the heart transplant Humana had decided that Mr. Via did not meet Medicare guidelines for determining whether he was a good candidate. After an objection to Dr. Lankford's conclusions by Loyola's doctors, Humana affirmed its denial of benefits. Eventually, about 6 months after this lawsuit was filed, Humana did pay Loyola for all medical charges incurred prior to the implantation of the artificial heart.

Loyola brought suit under the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a)(1), for payment of the remaining expenses associated with the Jarvik implant and heart transplant. The expenses totaled approximately $500,000. Judge Harry D. Leinenweber granted Humana's motion for summary judgment and denied Loyola's cross-motion for partial summary judgment. Loyola appeals.

### The Policy

The portion of the group health benefit plan pertinent to Mr. Via's surgeries, the "Major Transplant Benefit Rider," reads as follows:

> Contrary to any limitations on major transplants contained in the Group Policy, we will pay benefits under this rider for covered major transplant expenses, as defined below, incurred by an insured person for an approved major transplant.
>
> **MAJOR TRANSPLANT** means pretransplant, transplant and post-discharge services, supplies, care and treatment received for or in connection with the medically necessary transplantation of the following human organs or tissue: heart, liver, kidney and bone marrow.
>
> For a major transplant procedure to be considered approved to this Major Transplant Benefit, prior approval from our Medical Affairs Department in advance of the procedure is required. Such approval will be based on written criteria and procedures established by our Medical Affairs Department.... If approval is not given, benefits will not be provided for the procedure.
>
> . . . .
>
> **EXCLUSIONS**
>
> No benefit is payable for or in connection with a major transplant if:
>
> 1. Our Medical Affairs Department is not contacted for prior authorization of the procedure.
> 2. Our Medical Affairs Department does not approve coverage for the procedure, based on established criteria for medical necessity or based on a determination that the procedure is experimental for the condition involved.

All issues in this case turn on this quoted language of the major transplant benefit rider.

### The Standard of Review

We review *de novo* Judge Leinenweber's decision granting summary judgment. *Panozzo v. Rhoads*, 905 F.2d 135, 137 (7th Cir.1990). To prevail on the motion for summary judgment, Humana has to show

through the pleadings, depositions, answers to interrogatories, and affidavits that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Federal Rule of Civil Procedure 56(c). The initial burden is on the moving party to show that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once the movant has satisfied this burden, the party opposing the motion must come forward with evidence to show that there remains an issue of fact to be tried. Fed.R.Civ.P. 56(e).

■ For analysis of the denial of benefits, the *de novo* standard of review applies unless a benefit plan gives its plan administrator discretionary authority to construe the terms of the plan or determine who is eligible to receive benefits. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In the event that the administrator's discretion is unrestrained or limited only by the requirement of good faith, the arbitrary and capricious standard of review is proper. *Exbom v. Central States Southeast and Southwest Areas Health and Welfare Fund*, 900 F.2d 1138, 1142 (7th Cir. 1990). Under the arbitrary and capricious standard, a denial of benefits will not be set aside if the denial was based upon a reasonable interpretation of the plan documents. *Exbom*, 900 F.2d at 1142–43; *Shull v. State Machinery Co. Employees Profit Sharing Plan*, 836 F.2d 306 (7th Cir.1987). If the administrator makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts, then the administrator's decision is final. *Exbom*, 900 F.2d at 1143. Judge Leinenweber applied the arbitrary and capricious standard.[1]

■ The Humana benefit plan does not contain any magic words granting discretion to the plan administrator. But the major transplant benefit rider provides that for a heart transplant to be covered, prior approval from Humana's Medical Affairs Department in advance of the procedure is required and that "[s]uch approval will be based on *written criteria and procedures established by our Medical Affairs Department....* If approval is not given, benefits will not be provided for the procedure." (Emphasis added.) The exclusion clause states that no major transplant benefit is payable if Humana's "Medical Affairs Department does not approve coverage for the procedure based on established criteria for medical necessity or based on a determination that the procedure is experimental for the condition involved." A general limitations clause in another portion of the plan expressly excludes "experimental procedures or treatment methods as determined by us or the appropriate technological assessment body established by the state or federal government."

Loyola, desiring the broader *de novo* standard of review, argues that the plan does not give Humana discretionary authority. Pointing to *Adams v. Blue Cross/Blue Shield, Inc.*, 757 F.Supp. 661 (D.Md.1991), Loyola contends that the language "as determined by us" is vague and ambiguous. Loyola further asserts that the plan does not contain any definition of either "experimental procedures or treatment methods" or "experimental for the condition involved." According to Loyola, nowhere is authority granted to the administrator to construe these ambiguous terms.

We disagree. We believe that the benefits plan gives Humana's Medical Affairs Department discretion. Discretion in regard to prior approval and eligibility for major transplant coverage is two-fold: discretion in establishing the criteria[2] for coverage and then discretion in applying the criteria to each

---

1. Although there is some uncertainty within this circuit regarding the standard to be applied when *de novo* review is rejected, *see Lister v. Stark*, 942 F.2d 1183, 1187–88 (7th Cir.1991) (discussing uses of the arbitrary and capricious standard versus the abuse of discretion standard), neither party before us has argued that the alternative to *de novo* review is anything other than the arbitrary and capricious standard.

2. At the time of Mr. Via's illness, Humana had chosen as its criteria for approval of heart transplant coverage those used by the Health Care Financing Administration as outlined in the Federal Register. *See* R. 57, ex. A at H–91.

patient's situation. Exclusions from major transplant coverage are determined based on either standard criteria or on a determination within the discretion of the Medical Affairs Department that the procedure is experimental. This provision gives Humana the authority to interpret what "experimental" means. In sum, these provisions indicate that coverage determinations and definition of the terms pertinent to this case are committed to the discretion of Humana's Medical Affairs Department.

Loyola relies heavily upon *Adams* in making its argument for *de novo* review. In *Adams,* the relevant plan language excluded as "experimental" procedures and treatments that were "not generally acknowledged as accepted medical practice by the suitable practicing specialty in Maryland, *as decided by us.*" *Adams,* 757 F.Supp. at 664, 666–67 (emphasis added). The district court in *Adams* determined that the language italicized above was vague and ambiguous and did not confer discretionary authority on the plan administrator. *Id.* at 667.

In this case, though, sufficient discretion is given in regard to major transplants alone to warrant the arbitrary and capricious standard. The statement from another portion of the policy on experimental procedures "as determined by us" is unnecessary for this determination and was not even used by Judge Leinenweber in making this call. Moreover, *Adams* is distinguishable. The benefit plan in *Adams* contained no other language possibly giving the administrator discretion. As stated above, in this case other language granting discretion makes the "as determined by us" language less ambiguous. Also, even the *Adams* court acknowledged that the disputed language could possibly be said to confer authority to resolve eligibility disputes, although not to construe ambiguous terms. In regard to construing plan terms, the policy in *Adams* defined "experimental" and "investigative" as the use of any treatment or procedure not generally acknowledged by the suitable medical specialty in the state. The court ruled that the phrase "as decided by us" could not create the power to deviate from or change the contractual definitions. In this case, howev-

er, the plan did not define the term "experimental" at all, choosing instead to leave the decision within Humana's discretion. In the case before us, the "as determined by us" language only adds more weight to the argument that the plan administrator has discretion.

### The Artificial Heart

■ Humana determined that the artificial heart implant procedure fell under the exclusion clause as experimental and denied coverage. Loyola argues that regardless of the standard applied, a genuine issue of material fact exists as to whether the Jarvik–7 as used in Mr. Via's case was "experimental for the condition involved." According to Loyola, the Jarvik was considered a successful bridge to human heart transplantation and was no experiment on Mr. Via; it was implanted to save Mr. Via's life.

The fact that a procedure is medically necessary does not obviate the possibility that it may also be experimental. Judge Leinenweber acknowledged the position of Loyola's experts but correctly pointed out that even those experts admitted that the use of the device was experimental. The deposition statements of cardiologist Dr. Maria Rosa Costanzo–Nordin, the medical director of the Loyola transplant program, are most telling:

Q. Now, you used the word "experimental," I believe, in describing the Jarvik; is that right?

A. Yes.

Q. What do you mean by "experimental"?

A. That the device is under study and that the FDA has not made a final determination as to its approval to be used as a standard of care.

Q. So that at least throughout the use by Loyola of Jarvik artificial hearts during that entire time, the device was experimental; is that right?

A. It still is.

Q. And it was then, correct?

A. It was then.

Dr. Costanzo–Nordin continued, describing the general treatment of artificial hearts by insurers:

> Q. Are you familiar with the Medicare guidelines for heart assist devices?
>
> A. Yes, I am.
>
> Q. And are you aware that they are considered experimental by Medicare?
>
> A. Yes, they are considered experimental by everybody since the FDA has not approved them yet.

Other undisputed evidence, such as a handbook prepared by Loyola and given to Jarvik patients, indicated that the Jarvik's use was part of an experimental study: "Your surgeon is using the Jarvik–7 artificial heart as an investigator in an *experimental study* to determine if an artificial heart can prolong life in patients with terminal heart disease until cardiac transplantation can be performed." (Emphasis in original.) Kathleen Grady, a registered nurse at Loyola, and Dr. Nordin admitted at deposition that Loyola had a specific consent form that patients completed prior to prospective use of the Jarvik. That 7–page consent form provided that "[t]he artificial heart proposed for use in my case is an experimental device not yet approved by the FDA for routine use and as such its implantation constitutes research." By signing the form, the patient stated that

> I am being asked to participate in a study conducted at Loyola University Medical Center ... to evaluate the ability of the SYMBION J[arvik]–7 artificial heart to support my circulation temporarily until a suitable human heart for transplantation becomes available.
>
> . . . .
>
> The purpose of this research is to study the possibility that an artificial heart can prolong life in patients with terminal heart disease until cardiac transplantation can be performed.
>
> . . . .
>
> Once the total artificial heart is implanted I will remain a subject in this experiment until a human transplant can be carried out.

Loyola's argument is that the use of the Jarvik in Mr. Via's case had nothing to do with an experiment; the purpose was therapeutic and necessary to save his life. Loyola presented evidence from Dr. Nordin and an expert, Dr. O.H. Frazier, chief of the Texas Heart Institute's Transplant Service, on the use in Via's case. Dr. Frazier, for instance, stated: "Although mechanical assist devices as a bridge to orthotopic heart transplantation are classified by the FDA as investigational, in reality they are therapeutic for a subset of patients with heart failure, such as Mr. Via, whose alternative was certain death."

The strongest evidence for Loyola consisted of Dr. Sullivan's statements. At his deposition, Dr. Sullivan, the surgeon, testified that he considered the Jarvik to be "investigational" rather than experimental. In an affidavit he stated that the treatment was not "purely educational or experimental in nature, nor was it provided primarily for the purpose of medical research." When he implanted the Jarvik–7 in Mr. Via, he was trying to save Mr. Via's life, not conducting a medical experiment. No material issue of fact arises from these statements, though. First, even Dr. Sullivan stated that the difference between "investigational" and "experimental" was likely a problem with semantics. Loyola's counsel admitted the same at oral argument. Second, as Judge Leinenweber found, the policy does not specify that a procedure has to be exclusively experimental in nature for coverage to be excluded. It was certainly not arbitrary or capricious for Humana to interpret the term "experimental" to encompass procedures that are partially experimental.

And, again, the fact that Mr. Via's doctors were trying to save his life rather than conduct an experiment does not remove the use of the Jarvik heart from the realm of "experimental" procedures. Saving life is the purpose of most experimental procedures, we would hope. In this case, saving Mr. Via's life by use of the Jarvik–7 was completely in line with the nature of the experimental study described in the consent form: "to study the possibility that an artificial heart can prolong life in patients with terminal heart disease until cardiac transplantation can be performed." The experimental na-

ture and research of the Jarvik heart implantation are not diminished just because the procedure was the only choice and happened to be successful.

No genuine issue of material fact exists on this point. Humana's denial of benefits was based on a reasonable interpretation of the terms "experimental for the condition involved" and thus was not arbitrary and capricious.

### The Human Heart Transplant

As stated in the major transplant benefit rider, the policy requires prior approval by Humana before a heart transplant takes place. If approval is not given, "benefits will not be provided for the procedure." Judge Leinenweber agreed with Humana that the prior approval requirement constituted a condition precedent to coverage that Loyola failed to meet. Loyola admits that the plan required prior approval and that it did not receive prior approval for the human heart transplant.

On appeal, as at the district court level, Loyola argues that Humana either waived the condition or should be estopped from relying upon it. Loyola presses two reasons for waiver. First, the prior approval issue was not used as a basis for denial in Humana's denial-of-benefits letter. Second, Loyola contends that one of its employees, Cynthia Sepkowski, was told by Humana employee Lisa Hogan that no determination about coverage would be made until final billing. Sepkowski's handwritten notes from the August 16, 1988, conversation state:

> Asked if letter needs to be sent by medical staff etc.—Lisa claims determination will be made through final billing—NO PRIOR determination.

The estoppel argument involves the same statement by Ms. Hogan to Ms. Sepkowski, which supposedly precluded Loyola from seeking public assistance for Mr. Via's care.

■ Waiver is a voluntary and intentional relinquishment of a known right. *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 659 (8th Cir.1992); *Vaughn v. Speaker,* 126 Ill.2d 150, 161, 127 Ill.Dec. 803, 808, 533 N.E.2d 885, 890 (1988), *cert. denied,* 492 U.S. 907, 109 S.Ct. 3218, 106 L.Ed.2d 568 (1989). It arises from a unilateral, affirmative act by the insurer. *Western Casualty & Surety Co. v. Brochu,* 105 Ill.2d 486, 499, 86 Ill.Dec. 493, 499, 475 N.E.2d 872, 878 (1985). The party claiming waiver has the burden of proving that the insurer's words or conduct were inconsistent with an intent to rely on the provisions of the policy. *See Buchalo v. Country Mutual Ins. Co.,* 83 Ill.App.3d 1040, 1046, 39 Ill.Dec. 89, 94, 404 N.E.2d 473, 478 (1st Dist.1980). The evidence must be clear, precise, and unequivocal. *Id.*

■ The first waiver argument fails. The mere omission of a defense in a letter to a plan beneficiary does not constitute a waiver of the defense. *See Farley,* 979 F.2d at 659; *Ladd Construction Co. v. Insurance Co. of North America,* 73 Ill.App.3d 43, 49–50, 29 Ill.Dec. 305, 310, 391 N.E.2d 568, 573 (3d Dist.1979). Nothing in Humana's letters expresses an intention to surrender its right to enforce other applicable provisions of the policy. Although letters to Loyola of December 28, 1988, and February 13, 1989, base the denial of benefits mainly on Humana's opinion that Mr. Via was not a good heart transplant candidate, a January 19, 1989, letter to Mr. Via's widow, in fact, refers to the lack of prior notice in explaining the reasons for denial. Loyola has offered no evidence of an intention on Humana's part to waive the prior approval argument. Judge Leinenweber's rejection of this argument was correct.

■ In regard to the second waiver argument, Loyola hangs its hat on Ms. Sepkowski's notes and testimony that she was told no prior determination would be made. Loyola contends that the difference between what Ms. Sepkowski was told and Humana's present stance creates an issue of fact. Ms. Sepkowski's notes and statements raise no issue of fact, however. Accepting Loyola's story as true for purposes of this summary judgment motion eliminates any factual dispute. The only remaining issue on this point is not about disputed facts, but instead whether Hogan's statement established a waiver.

We believe that it did not. As stated above, evidence of waiver must be clear, pre-

cise, and unequivocal and inconsistent with an intent to rely on the provisions of the policy. Throughout Mr. Via's hospitalization Humana's conduct was consistent with its intent to adhere to, not waive, the plan's requirement that prior approval for the heart transplant was a condition precedent to coverage. On August 8, 1988, Sue Mattingly, the transplant case specialist at Humana's Department of Medical Affairs, wrote to Loyola, stating that a request for heart transplant had to be reviewed before coverage could be granted and requesting various information and clinical documentation on Mr. Via's condition and diagnosis. Ms. Mattingly testified at her deposition that she had informed Loyola of the prior approval requirement and requested documentation by telephone on two prior occasions, although the person at Loyola whose name she gave could not recall whether they had spoken. Consistent with that position, though, Ms. Mattingly wrote a second letter on September 9, 1988, mentioning the prior approval requirement and again requesting the documentation. These actions by Ms. Mattingly—especially the September 9 letter over 3 weeks after the Hogan/Sepkowski conversation—show that no waiver occurred and that Humana did not abandon its intent to require prior approval.

■ Estoppel is distinguished from waiver in that it arises by operation of law to abate the rights and privileges of an insurer where inequity would otherwise result due to prejudicial reliance of the insured upon some act, conduct, or failure to act by the insurer. *F/H Industries, Inc. v. Nat'l Union Fire Ins. Co.,* 116 F.R.D. 224, 229 (N.D.Ill.1987); *Western Casualty,* 105 Ill.2d at 500, 86 Ill.Dec. at 500, 475 N.E.2d at 879. In other words, estoppel occurs when one party knowingly misrepresents or conceals a material fact and the other party, not knowing the truth, reasonably relies on that misrepresentation or concealment to his detriment. *Black v. TIC Invest. Corp.,* 900 F.2d 112, 115 (7th Cir. 1990); *Vaughn,* 126 Ill.2d at 162–163, 127 Ill.Dec. at 808, 533 N.E.2d at 890. The party asserting estoppel must show that it "would not have so acted but for the conduct or representations of the other party and that [it] had no knowledge or convenient means of ascertaining the true facts which would have prompted [it] to react otherwise." *De Graw v. State Security Ins. Co.,* 40 Ill.App.3d 26, 34, 351 N.E.2d 302, 309 (1st Dist.1976).

■ At the time of Mr. Via's treatment, Loyola had a contract with the Illinois Department of Public Aid, which provided benefits for transplants. A patient could not qualify for public aid under Illinois law if he had substantial assets or private medical insurance. Loyola argues that it relied on Ms. Hogan's statement to Ms. Sepkowski that a determination would be made upon final billing and thus was precluded from applying on Mr. Via's behalf for public assistance. Mr. Via was supposedly deprived of the opportunity to spend down his assets and qualify for public aid because Humana refused to make a decision.

No issue of fact exists on this issue and Humana wins on the law. Ms. Sepkowski's testimony does not indicate that Ms. Hogan said the transplant would indeed be covered; instead, Ms. Sepkowski stated that she was told that "there was no guarantee of payment for anything." Ms. Sepkowski's own contemporaneous notes state "no guarantee." Because prior approval had not been given, coverage was in no way promised. This is not a case where Humana induced Mr. Via to go ahead with the transplant or ignore other payment possibilities by suggesting that the procedure would be covered. If Loyola assumed that coverage would be granted based on a statement that a decision would be made later, that assumption was unreasonable and should not result in liability for Humana. Even if Loyola did not assume that coverage would be granted, it was in no way prevented from attempting to get public aid.

Moreover, Loyola's own documentation in fact belies its contention that it relied on Ms. Hogan's statement. On its billing records below Ms. Sepkowski's notes is the following:

> 9/8 ... Called Ann Olson to [check] on response to request from Humana ... dated 8/8/88.... Per Ann: no one in transplantation has responded to request. She will talk to doctors today.

If Loyola believed that no further action on its part was needed until final billing, there

would have been no reason to check on the response to Ms. Mattingly's letter.

In sum, prior approval was indeed a condition precedent. As the plan unambiguously states, no benefits are payable without prior approval. It is undisputed that necessary records on Mr. Via's condition were not sent by Loyola until after the heart transplant and that the records were not received by Humana until after Mr. Via's death. The prior-approval condition was not waived, nor should the doctrine of estoppel be applied. Loyola and Mr. Via were certainly free to go forward with the procedures involved in this case without getting prior approval, but the language in the plan does not obligate Humana to provide coverage for them.

### The Other Expenses

 Humana denied coverage for all expenses after the insertion of the Jarvik because it believed all subsequent expenses were connected to the experimental procedure and therefore were excluded under the rider. Loyola contends that even if coverage for the artificial heart implant and heart transplant are denied, it should nevertheless be paid for basic hospital expenses and other care given to Mr. Via after the operations.

At oral argument, Loyola suggested that Humana's present position on this issue is betrayed by its position on the human heart transplant above: If all expenses after insertion of the Jarvik are related to the Jarvik, then why not deny the heart transplant on that basis as well? Why make such a fuss over prior approval if the heart transplant, like other expenses, was related to the artificial heart?

The existence of an alternate argument on the most expensive portion denied by Humana is not improper, though. And, under the arbitrary and capricious standard, the basis for denial of benefits just has to be a reasonable interpretation of the plan documents. According to the plan, "major transplant" includes "pretransplant, transplant and post-discharge services, supplies, care and treatment received for or in connection with" the procedure. As stated in the exclusion clause, "[n]o benefit is payable for or *in connection with* a major transplant" if coverage for the

transplant is denied because the procedure was experimental for the condition involved. Because coverage for the Jarvik was denied as experimental, all treatment connected with the Jarvik could also be properly denied. Humana's determination that any expenses after insertion of the Jarvik were "in connection with" that procedure was not unreasonable. Mr. Via was kept alive for over a month on the artificial heart itself and would not have needed to receive the heart transplant and its related expenses otherwise. Although it seems callous for Humana to deny coverage for a life-saving procedure and thereafter deny all subsequent hospital expenses—in essence saying to Mr. Via "we will not cover you because you should be dead"—Humana's humanity is not the issue here. This is a contract case and the language of the benefit plan controls. Again, Loyola and Mr. Via were certainly free to attempt these life-saving procedures, but the benefits plan does not require Humana to pay for them.

Accordingly, the decision of the district court is AFFIRMED.