Douglas E. COKER, Sr., and
Susan Coker, Plaintiffs,

v.

TRANSWORLD AIRLINES INC., Cooper-
ative Group Insurance Plan for Employ-
ees of TWA Inc., and Transworld Air-
lines Inc. Retirement Plan, Defendants.

No. 96 C 2360.

United States District Court,
N.D. Illinois,
Eastern Division.

April 9, 1997.

Suzanne McCarthy, Chuhak & Tecson, P.C., Chicago, IL, for Plaintiffs.

Thomas James Piskorski, Anna M. Scruggs, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

Before the court is defendant Transworld Airlines Inc.'s ("TWA"), the TWA Retirement Plan for Mechanics and Related Employees, Dining Service Employees and Passenger Service Employees' ("the Retirement Plan"), and the TWA Group Medical, Dental and Disability Income Benefit Plans' ("the Group Benefit Plans")[1] (collectively, "defendants") motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, the court grants defendants' motion.

## I. BACKGROUND[2]

Mr. Coker has worked for TWA since October 1986[3] as a ramp service employee at O'Hare International Airport ("O'Hare") in Chicago, Illinois. He has been a member of the District Lodge 142 of the International Association of Machinists and Aerospace Workers, AFL–CIO ("IAM"), during his employment with TWA. Mr. Coker was covered by a collective bargaining agreement ("CBA") between the IAM and TWA throughout his employment with TWA.

As a TWA employee, Mr. Coker participated in TWA's benefit plans. As Mr. Coker's spouse, Mrs. Coker was a covered dependent under the Group Benefit Plans. The Group Benefit Plans provided health, life insurance, temporary disability, long-term disability, and death benefits to eligible employees of TWA and their spouses. The Retirement Plan provided retirement benefits to eligible employees of TWA.

On September 30, 1992, Mr. Coker was laid off, or furloughed. The IAM filed a grievance with the System Board of Adjustment ("the Board"), disputing the furlough on the ground that TWA had violated its CBA with the IAM by using American Airlines employees to staff its ground operations.

Article 20 of the IAM–TWA CBA pertained to medical benefits and provided that a furloughed employee with at least 10 years of compensated service would continue to receive medical coverage for 12 months after the date of furlough or until he obtained new employment, whichever occurred first. Mr. Coker qualified as having at least 10 years of compensated service with TWA.[4] At the time of his furlough, Mr. Coker had a copy of the CBA and knew that the CBA covered medical benefits. Mr. Coker also had a copy of a booklet entitled "TWA Group Medical, Dental and Disability Income Benefit Plans" ("Summary Plan Description," or "SPD"). The SPD contained basically the same provision of medical insurance for furloughed employees as the CBA, but provided that the benefits would terminate either in 12 months

---

1. Plaintiffs incorrectly sued the Retirement and Group Benefit Plans as Cooperative Group Insurance Plan for Employees of TWA Inc. and Transworld Airlines Inc. Retirement Plan, respectively.

2. These facts are taken from plaintiffs' complaint, the parties' Local Rule 12(M) and 12(N) statements, plaintiffs' depositions, and exhibits.

3. Mr. Coker's complaint states that he has worked for TWA for 29 years, but in his deposition he stated that he began working for TWA in October 1986, when TWA took over Mr. Coker's former employer, Ozark Airlines. The conflict does not matter for purposes of this opinion, so the court will follow Mr. Coker's deposition testimony regarding this fact.

4. The court presumes that Mr. Coker's prior employment with Ozark Airlines counted towards his 10 or more years of compensated service with TWA.

or when the furloughed employee obtained medical insurance through other employment, whichever occurred first.

On September 30, 1992, Mr. Coker's last day of work before his furlough took effect, Mr. Coker attended a meeting for furloughed employees. At this meeting, TWA's local station manager handed out a memorandum describing post-furlough group medical benefits and continuation of benefits under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. § 1161. The station manager and the furloughed employees, including Mr. Coker, also discussed TWA's group medical benefits and COBRA as they pertained to furloughed employees.

In addition, the SPD explained that continued coverage was available under COBRA for 18 months from the date that coverage otherwise would have terminated. Mr. Coker understood that he could elect to receive COBRA benefits once his furlough insurance benefits had expired and thought that he would receive further information from TWA about COBRA. However, plaintiffs never received the letter that TWA sent to furloughed employees in November 1992 explaining COBRA coverage or any other information or application materials regarding COBRA benefits. When the 12–month post-furlough benefit period expired at the end of September 1993, Mr. Coker did not contact TWA or the Group Benefit Plans regarding his TWA medical benefits or COBRA coverage. Plaintiffs never applied for continued medical benefits under COBRA.

Notwithstanding that the 12–month benefit period had ended and that plaintiffs had not applied for COBRA coverage, in November 1993 and November 1994, plaintiffs received notices from TWA giving employees covered by TWA's group medical benefit plan the option to convert to a health maintenance organization. Plaintiffs also received prescription cards and information regarding doctors. So, plaintiffs assumed that they still were covered under TWA's insurance. However, they did not contact TWA, the Group Benefit Plans, or anyone else to verify their coverage. Nor did they inform TWA or the Group Benefit Plans that Mr. Coker had obtained other employment in December

1992 and insurance through his employment in May 1993. Mr. Coker was employed at United Airlines ("United") part-time during December 1992, May 1993 to April 1994, and May 1995 to August 1995. He became a full-time employee with United in August 1995 and continues to work there. Plaintiffs were entitled to medical benefits while Mr. Coker was employed with United from May 1993 to April 1994 and from May 1995 to the present. However, Mrs. Coker's pre-existing condition apparently was not covered by United's medical benefits during those time periods.

During January and February 1995, while Mr. Coker was still furloughed, Mrs. Coker incurred medical expenses from three separate hospital admissions relating to several pre-existing medical conditions. Prior to each hospitalization, Aetna Life Insurance Company ("Aetna"), the Group Benefit Plans' third party administrator, approved, or certified, Mrs. Coker's hospital admission by phone conversation with Mr. Coker. Plaintiffs also received copies of notices of certification, each of which contained the following statement, boxed off from the rest of the text and written in bold type and capital letters:

> Certification is based upon the medical information provided.... This notice is *not* a guarantee of benefits. Payment of benefits is subject to any subsequent review(s) of medical information or records, the patient's eligibility on the date the service is rendered, and any other contractual provisions of the plan.

Plaintiffs had received such notices prior to 1995.

Aetna paid nearly the entire amount of the first bill, but denied payment for the remainder of the first bill and the subsequent bills because TWA had discovered that Mr. Coker was no longer eligible for medical benefits under the Group Benefit Plans. In fact, plaintiffs' medical benefits through TWA should have ended September 30, 1993, at the latest, and possibly as early as December 1992, when Mr. Coker obtained other employment, or May 1993, when Mr. Coker received other medical insurance. However, because of an administrative mistake by TWA, plaintiffs continued to receive medical

benefits until February 24, 1995, when TWA realized its mistake.

On March 2, 1995, the IAM notified Mr. Coker that the Board had found that TWA was in violation of its obligations under the CBA with respect to furloughed O'Hare ramp service employees, including Mr. Coker. The award ordered TWA to reinstate the O'Hare employees and provide them with make-whole relief consisting of back pay for the furlough period. Mr. Coker was reinstated on June 26, 1995, and since then has worked part-time with TWA and been covered under TWA's benefit plans. However, Mr. Coker did not receive any back pay under the award because the compensation he received from his other employment during his furlough was more than he would have earned at TWA during his furlough.

Mr. and Mrs. Coker sued defendants because of the denial of medical benefits in January and February 1995, alleging federal promissory estoppel and breach of contract claims (Counts I and III, respectively) and a claim for interference with protected rights under the Employee Retirement Income Security Act ("ERISA"), as amended, 29 U.S.C. § 1140 (Count II). Defendants now move for summary judgment on all counts. However, the court dismissed Counts II and III for lack of subject matter jurisdiction when it granted in part and denied in part defendants' earlier filed motion to dismiss. *See* Memorandum Opinion and Order dated March 13, 1997. Thus, only Count I remains pending against defendants.

## II. DISCUSSION

### A. Standard for deciding a motion for summary judgment

A motion for summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The burden is on the moving party to show that no genuine issues of material fact exist. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Once the moving party presents a *prima facie* showing that it is entitled to judgment as a matter of law, the party opposing the motion may not rest upon the mere allegations or denials in its pleadings but must set forth specific facts showing that a genuine issue for trial exists. *Anderson*, 477 U.S. at 256–57, 106 S.Ct. at 2514; *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir.1989). All reasonable factual inferences must be viewed in favor of the non-moving party. *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir. 1989).

### B. Local Rules 12(M) and 12(N)

Local rules of a federal district court are written by and for district judges to deal with the special problems of their court. *Bell, Boyd & Lloyd v. Tapy*, 896 F.2d 1101, 1103 (7th Cir.1990) (district courts need to streamline their procedures in response to unprecedented caseloads). General Rule 12(M) of the United States District Court for the Northern District of Illinois ("Local Rule 12(M)") requires a party moving for summary judgment to submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law." Local Rule 12(M); *Curde v. Xytel Corp.*, 912 F.Supp. 335, 338 (N.D.Ill. 1995). General Rule 12(N) of the United States District Court for the Northern District of Illinois ("Local Rule 12(N)") requires the non-movant to submit a concise response to the movant's 12(M) statement that contains "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." Local Rule 12(N)(3)(a); *Curde*, 912 F.Supp. at 338.

In addition, Local Rule 12(N)(3)(b) requires the non-movant to submit "a statement, consisting of short numbered paragraphs, of any additional facts that require

the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." Local Rule 12(N)(3)(b); *Curde*, 912 F.Supp. at 338. If either the movant or the non-movant in a summary judgment motion fails to respond properly to the facts set out by the opponent, the court may deem those facts to be admitted. Local Rules 12(M), 12(N)(3)(b). The Seventh Circuit consistently has upheld this strict application of Local Rule 12(N). *Zoltek v. Safelite Glass Corp.*, 884 F.Supp. 283, 285 (N.D.Ill.1995) (collecting cases).

■ The court notes that plaintiffs did not file a Rule 12(N) statement of additional facts. The court further notes that many of plaintiffs' responses to defendants' Rule 12(M) statement of facts violate "the rigorous requirements of specificity and documentation that Rule 12(M) imposes." *Tapy*, 896 F.2d at 1103. For example, some of plaintiffs' responses are simply nonsensical, as where Mrs. Coker admits but Mr. Coker denies that Mrs. Coker is Mr. Coker's wife, (Local Rule 12(N) Statement ¶ 4), or where Mrs. Coker admits but Mr. Coker denies that Mr. Coker was represented by the IAM. (*Id.* ¶ 5.) Other responses admit in part and deny in part the Local Rule 12(M) statement, but fail to specify what part is admitted and what part is denied. (*See, e.g., id.* ¶ 16.) Yet other responses deny the undeniable, such as where plaintiffs deny the literal text of the CBA. (*See, e.g., id.* ¶ 12.) In other responses, plaintiffs deny what they expressly acknowledge in their depositions. (*See, e.g., id.* ¶¶ 13(b), 14(b).) Finally, many responses either consist wholly of or contain a legal argument rather than a factual statement. (*See, e.g., id.* ¶¶ 2, 4, 5, 9, 22.)

■ In short, plaintiffs' Local Rule 12(N) responses to defendants' Local Rule 12(M) statement of facts seem calculated to confuse the factual issues in this case rather than clarify them. In accordance with Local Rules 12(M) and 12(N), the court may deem admitted the Local Rule 12(M) statements to which plaintiffs failed to respond properly, which would be a majority of the statements. However, in order not to punish plaintiffs for the defective Local Rule 12(N) responses

prepared by their counsel, the court will not strike any of plaintiffs' Local Rule 12(N) responses or deem admitted the Local Rule 12(M) statements to which plaintiffs did not respond properly. The court was able to glean the relevant facts partly from the Local Rule 12(M) and 12(N) statements and primarily from the depositions and exhibits submitted by the parties, and will decide the motion for summary judgment based on those facts.

## C. *Defendants' motion for summary judgment on Count I*

As a preliminary matter, the court notes that Count I is not directed at the Retirement Plan and contains no allegations implicating the Retirement Plan. Therefore, Count I is dismissed with prejudice as to the Retirement Plan. When the court refers to "defendants" in the following discussion, it refers only to TWA and the Group Benefit Plans.

Defendants contend that they deserve summary judgment on plaintiffs' promissory estoppel claim because plaintiffs cannot establish any of the elements of such a claim. Plaintiffs counter that based on the communications they received from defendants, they assumed that their post-furlough medical benefits were still in effect as late as February 1995, and therefore that they are entitled to receive payment for Mrs. Coker's hospital bills. Specifically, plaintiffs allege that TWA's letters in November 1993 and November 1994, which implied that plaintiffs were covered under TWA's group medical insurance, and the Group Benefit Plans' certifications, through Aetna, of Mrs. Coker's hospital admissions in January and February 1995 essentially created a promise of plaintiffs' continued coverage under TWA's medical insurance.

Courts are split as to whether a federal common law doctrine of promissory estoppel even exists under ERISA, because there is some concern that promissory estoppel contradicts the policy against oral modifications of ERISA plans. *See* 29 U.S.C. §§ 1102(a)(1), 1102(b)(3) (mandating that ERISA plans be in writing and amended pursuant to procedures set forth in the

plans); *Schoonmaker v. Employee Savings Plan of Amoco Corp.*, 987 F.2d 410, 412 (7th Cir.1993) (citing *Musto v. American General Corp.*, 861 F.2d 897 (6th Cir.), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989); *Cefalu v. B.F. Goodrich Co.*, 871 F.2d 1290 (5th Cir.1989)) (oral representations or other informal statements cannot be used to contradict or supersede terms of an ERISA plan). However, the Seventh Circuit has recognized that promissory estoppel is part of the common law that courts of appeals are required to create in order to plug gaps in ERISA, and so has recognized a federal common law cause of action for promissory estoppel under ERISA. *See Miller v. Taylor Insulation Co.*, 39 F.3d 755, 758 (7th Cir.1994) (citing *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989); *Thomason v. Aetna Life Ins. Co.*, 9 F.3d 645, 647, 649–50 (7th Cir.1993); *Black v. TIC Investment Corp.*, 900 F.2d 112, 114–15 (7th Cir.1990)). The Seventh Circuit has limited its holding to written promises that modify ERISA plans, and has indicated that the policy against oral modifications of ERISA plans "may bar using the concept of estoppel to modify the terms of a written plan on the basis of an oral promise." *Miller*, 39 F.3d at 759 (citations omitted). Nonetheless, the *Miller* court expressly noted that the issue remains unresolved in this circuit. *Id.*

■ Though the Seventh Circuit has not yet decided whether or not a promissory estoppel claim can be based on oral promises modifying an ERISA plan, ERISA itself seems to indicate that an oral promise cannot effectively modify an ERISA plan. *See* 29 U.S.C. §§ 1102(a)(1), 1102(b)(3). Consequently, to the extent that plaintiffs contend that defendants made any oral misrepresentations to plaintiffs, such as that an Aetna representative told Mr. Coker by telephone that Mrs. Coker's hospitalization would be covered under the Group Benefits Plan, (*see* D. Coker Dep. at 68), the court finds that such oral representations cannot form a basis of plaintiffs' promissory estoppel claim.

■ In the Seventh Circuit, a plaintiff bringing a promissory estoppel claim must show that

1) the opposing party knowingly misrepresented or concealed a material fact; 2) the complaining party, not knowing the truth, reasonably relied on that misrepresentation or concealment; 3) the complaining party suffered detriment; and 4) the complaining party had no knowledge or convenient means of ascertaining the true facts which would have prompted it to react otherwise.

*Sumpter v. Mack Chicago Corp.*, 918 F.Supp. 256, 259 (N.D.Ill.1996) (quoting *Krawczyk v. Harnischfeger Corp.*, 41 F.3d 276, 280 (7th Cir.1994) (citing *Loyola Univ. of Chicago v. Humana Ins. Co.*, 996 F.2d 895, 902 (7th Cir.1993))). The doctrine of promissory estoppel prevents a party from benefitting from its own misrepresentations. RESTATEMENT (SECOND) OF CONTRACTS 90 cmt. a ("Estoppel prevents a person from showing the truth contrary to a representation of fact made by him after another has relied on the representation").

After reviewing the evidence submitted by the parties, the court finds that plaintiffs raise a sufficient question of fact as to whether they suffered detriment from TWA's actions, but that no questions of fact exist as to the remaining elements of promissory estoppel.

### 1. Detriment suffered

■ Defendants contend that plaintiffs suffered no detriment as a result of any alleged misrepresentations by defendants because Mrs. Coker would have been hospitalized and incurred hospital bills even if plaintiffs had been told that they were not covered under TWA's medical plan. That is, nothing would have been different had defendants told plaintiffs that they were no longer participants in the benefit plan.

■ To establish that they suffered detriment from defendants' alleged misrepresentations, plaintiffs must establish that they would not have acted as they did "but for the representations of" defendants. *Loyola*, 996 F.2d at 902. In his deposition, Mr. Coker testified that had he not received from TWA in November 1993 and 1994 the pamphlets implying that he and Mrs. Coker were covered by TWA's medical benefits, he would

have sought different medical insurance. (Mr. Coker's Dep. at 81.) If Mr. Coker had obtained other medical insurance, it is possible that Mrs. Coker's hospitalizations would have been covered under the other insurance. Instead, plaintiffs did not obtain other insurance and incurred hospital bills that were not covered by Mr. Coker's furloughed employee medical benefits. Thus, plaintiffs have raised a genuine issue of material fact regarding whether they suffered detriment because of TWA's alleged misrepresentations about plaintiffs' medical benefits.

However, plaintiffs suffered no detriment because of Aetna's notices of certification that authorized Mrs. Coker to be admitted to the hospital. Mr. Coker stated that neither he nor Mrs. Coker read any of the notices of certification because Aetna approved Mrs. Coker's hospitalizations by phone and the hospitals accepted the certifications, so it never occurred to Mr. Coker that he and Mrs. Coker were not covered by insurance. (D. Coker Dep. at 75–76.) Thus, plaintiffs suffered no detriment from Aetna's written representations because they did not rely on Aetna's written representations in any way.

The only representations of Aetna on which plaintiffs allegedly relied to their detriment were Aetna's oral representations that Mrs. Coker's hospitalizations were certified. (*See* D. Coker's Dep. at 68, 76.) If plaintiffs could base their claim on Aetna's oral representations, then plaintiffs would have presented sufficient evidence to raise a question of fact about whether they suffered detriment by relying on Aetna's oral representations. However, as the court already has noted, a promissory estoppel claim cannot be based on an alleged oral promise. *See Miller*, 39 F.3d at 759, 29 U.S.C. §§ 1102(a)( 1), 1102(b)(3). Thus, plaintiffs' promissory estoppel claim cannot be based on Aetna's oral representations by phone to Mr. Coker approving Mrs. Coker's hospital admissions.

Because plaintiff suffered no detriment from Aetna's actions on behalf of the Group Benefit Plans, plaintiffs have no promissory estoppel claim against the Group Benefit Plans. However, because the Seventh Circuit has not yet resolved the issue of oral modifications to ERISA plans and conceiv-

ably could expand its holding in *Miller* to include such oral promises, the court will address the remaining elements of promissory estoppel as to the Group Benefit Plans as well as TWA.

## 2. Knowing misrepresentation

■ Defendants next contend that their failure to remove plaintiffs from the insurance coverage rolls was due to an inadvertent clerical error, and therefore was not a knowing misrepresentation. The court agrees. Although plaintiffs allege that defendants' action of keeping them on the coverage rolls was not an administrative error, they have provided no evidence to support their contention. *See Krawczyk*, 41 F.3d at 280 (district court correctly granted summary judgment in favor of defendants on plaintiff's promissory estoppel claim where plaintiff provided no evidence that defendants knowingly misrepresented material fact).

The correspondence between plaintiffs' counsel and defendants shows that plaintiffs' medical benefits were extended past the 12–month post-furlough benefit period because of a clerical error by TWA. (*See* Coker Deps. Exh. 12 at C686, C690, C705.) Moreover, Mr. Coker acknowledged that TWA explained to him that TWA continued his medical benefits beyond the 12–month period following his furlough because of a clerical error, and that he had no reason to doubt the truthfulness of TWA's explanation. (D. Coker Dep. at 61.) Therefore, plaintiffs have failed to make any factual showing that TWA's representations regarding plaintiffs' insurance coverage were anything but unintentional administrative mistakes.

Similarly, plaintiffs have offered no evidence that Aetna told Mr. Coker that Mrs. Coker could be admitted to the hospital knowing that Mrs. Coker was not eligible for TWA's medical benefits. In fact, the notices of certification make clear that the certifications did not guarantee that benefits would be paid and that payment of benefits was subject to Mrs. Coker's eligibility for benefits. (*See* Coker Deps. Exh. 10.) Thus, it appears that Aetna did not make *any* misrepresentations regarding Mrs. Coker's in-

surance coverage, much less knowing or intentional misrepresentations.

Accordingly, the court finds that no question of fact exists regarding whether defendants intentionally misrepresented the facts regarding plaintiffs' medical coverage—they did not.

### 3. Knowledge of or convenient means of ascertaining true facts

 Defendants contend that plaintiffs had knowledge of and a convenient means of ascertaining the fact that they were no longer covered under TWA's medical plan in 1995, since Mr. Coker possessed copies of both the CBA and the SPD. Plaintiffs counter that they did not understand Mr. Coker's post-furlough medical benefits or COBRA rights and that these benefits were never explained to Mr. Coker.

The depositions and exhibits indicate that Mr. Coker actually knew that his furlough benefits would last 12 months and that COBRA benefits then would be available for a monthly premium. During his deposition, Mr. Coker stated that at the time of his furlough, he understood that TWA would provide 12 months of coverage and that he and Mrs. Coker would get a pamphlet in the mail regarding COBRA benefits. (D. Coker Dep. at 19.) Mr. Coker stated that he obtained this understanding in a "layoff letter" from TWA to employees and from a discussion with TWA's local station manager. (Id.)

The letter explicitly and in the form of a simple chart explained how long benefits would be continued for furloughed employees and their spouses, which in Mr. and Mrs. Coker's case was 12 months. (Coker Deps. Exh. 4 at C692.) The letter also stated explicitly, in an asterisked note directly following the chart setting forth the continuation periods, that the "extension of benefits will cease upon attainment of other insurance coverage as a result of [the furloughed employee's] obtaining other employment." (Id.) The letter also explained in a fair amount of detail the relevant COBRA provisions, including that COBRA coverage generally continued for up to 18 months from the date of furlough or until the employee became covered under another group health plan, whichever oc-

curred first, except that pre-existing conditions not covered under the new plan presumably were covered for the entire 18 months. (Id. at C694.) The letter also made clear that an employee choosing to receive coverage under COBRA must pay for the insurance. (Id.) While Mr. Coker did not read the letter immediately, he skimmed through it within the year, and he understood that the letter described his medical benefit rights as a furloughee. (D. Coker Dep. at 29.)

Mr. Coker received the layoff letter at a meeting conducted by TWA's station manager at O'Hare on September 30, 1992, Mr. Coker's last day of work before his furlough. (D. Coker Dep. at 21, 26.) At the meeting, the station manager and furloughed employees discussed the furloughed employees' medical benefit rights. and specifically that the furloughed employees, including Mr. Coker, would be covered for 12 months and that COBRA then would take over. (Id. at 23–24.) This informal meeting also contributed to Mr. Coker's understanding that TWA would provide him with 12 months of coverage and that a COBRA pamphlet would be sent to him in the mail. (Id. at 23.)

The layoff letter and the discussion with the station manager at the meeting held on September 30, 1992, gave Mr. Coker the actual knowledge that he was entitled to a maximum of 12 months of insurance coverage from TWA and six additional months of coverage under COBRA. Mr. Coker has admitted to knowing these facts.

Moreover, even if Mr. Coker did not actually know to what benefits he was entitled, he had readily available means of obtaining the information regarding his benefits. The layoff letter explained Mr. Coker's post-furlough medical benefits. It gave him clear notice that the TWA benefits would end within 12 months, or earlier if he obtained insurance through other employment, which he did by May 1993. The letter stated that furloughed employees need not contact TWA to request COBRA coverage because they would receive COBRA information shortly after furlough. (Coker Deps. Exh. 4 at C694.) However, it also provided the address to which employ-

ees could write for more information about the COBRA conversion privilege, and stated that application for COBRA benefits and payment of the first premium "must be made to Aetna ... within 31 days immediately following termination of coverage under the group plan." (*Id.*) Thus, this letter provided enough information to enable Mr. Coker to determine that he had to apply and pay premiums for COBRA benefits by the beginning of November 1993 at the latest and probably by June 1993, since he obtained insurance through his job with United in May 1993, and who to contact if he wanted to elect continued coverage under COBRA.

Mr. Coker also kept a copy of the IAM–TWA CBA during his employment with TWA. (D. Coker Dep. at 10.) He understood that the CBA covered the medical benefits to which he was entitled. (*Id.* at 10–11.) Article 20 of the CBA explicitly stated that a furloughed employee with at least 10 years of compensated service and his eligible dependents would receive insurance coverage for 12 months after the date of furlough, but that the coverage would be discontinued if the employee obtained other employment. (Coker Deps. Exh. 1 at 105.)

In addition, at the time of his furlough, Mr. Coker had a copy of the SPD, which set forth TWA's medical, dental, and disability benefits. (D. Coker Dep. at 12–13.) The SPD also explicitly stated that medical benefits for a furloughed employee with Mr. Coker's length of service and his dependents would continue for one year following the employee's termination from active service, but that the insurance would be discontinued if the employee obtained other insurance coverage by obtaining other employment. (Coker Deps. Exh. 2 at C037.)[5]

The layoff letter, CBA, and SPD provided ready references regarding the medical benefits to which Mr. and Mrs. Coker were entitled following Mr. Coker's furlough. Mr.

Coker could have ascertained the true facts regarding his and Mrs. Coker's medical benefits simply by reading the relevant portions of the letter, CBA, or SPD. Furthermore, Mr. Coker could have contacted TWA or the IAM if he was unsure about his benefits. If he did not take these or any other steps to determine what his and Mrs. Coker's medical benefits were following his furlough, then the responsibility for his lack of action and resultant lack of knowledge lies only with him.

The fact that TWA sent plaintiffs information in November 1993 and November 1994 regarding insurance coverage and implying that plaintiffs still were covered under TWA's medical benefits plan does not change this conclusion. Mr. Coker should have been on notice from the layoff letter, CBA, and SPD that he and Mrs. Coker were not entitled to TWA medical benefits after September 30, 1993, and more likely May 1993, when he obtained insurance through United; that he had to apply and pay the premiums for continued coverage under COBRA; and that, in any event, coverage under COBRA would last for no more than 18 months following his date of furlough. Thus, when the Cokers received TWA insurance information in November 1993, and again in November 1994, Mr. Coker easily could have contacted either his union or TWA to inquire into both his eligibility and the significance of the insurance information he had received, but "[i]t never occurred to [him] to call." (D. Coker's Dep. at 27.) Again, Mr. Coker should bear the responsibility for his failure to question whether he and his wife were covered by TWA insurance in November 1993 and November 1994.

Accordingly, the court finds that no question of fact exists regarding whether plaintiffs had the knowledge or convenient means of ascertaining that they were no longer entitled to TWA medical benefits—they had both.

---

5. The court notes that the layoff letter, SPD, and CBA contained conflicting provisions as to when a furloughed employee's medical benefits would terminate prior to the maximum 12–month period—once the employee received medical benefits from another employer, according to the SPD and layoff letter, or once the employee obtained other employment, according to the CBA. This conflict has no bearing on the court's decision, so the court need not resolve it. Mr. Coker obtained other employment with United by December 1992, and received medical benefits from United by May 1993. Consequently, under any provision, plaintiffs lost eligibility for TWA medical benefits long before the maximum 12–month period ended in September 1993.

#### 4. Reasonable reliance on the misrepresentation

Finally, defendants contend that plaintiffs could not have reasonably relied on the fact that they were still entitled to medical benefits in early 1995, over two years after Mr. Coker's furlough, because the layoff letter, CBA, and SPD made clear that this was not the case. Plaintiffs counter that they were reasonable in assuming they were still covered based on the insurance information they received from TWA in November 1993 and November 1994 and Aetna's pre-admission certifications in January and February 1995.

Reasonable reliance in this context is the "reasonable reliance of a reasonable man under all the circumstances pertaining to his condition of employment known or which should have been known to him." *Ulrich v. Goodyear Tire & Rubber Co.,* 792 F.Supp. 1074, 1081 (N.D.Ohio 1991), *aff'd,* 961 F.2d 1579 (6th Cir.1992). In the present case, plaintiffs' reliance on the insurance information from TWA and pre-admission certifications from Aetna was unreasonable.

As the court discussed in detail in subsection 3, above, Mr. Coker had plenty of ways to learn about his and Mrs. Coker's post-furlough medical benefits, including reading the CBA, SPD, or layoff letter, or simply contacting TWA or his union. Mr. Coker never read the CBA or SPD to determine his post-furlough medical benefit rights and only skimmed the layoff letter within a year after being furloughed, even though he knew that those documents contained information regarding his medical benefits. (D. Coker Dep. at 10–11, 13, 24, 27, 29.) Furthermore, he never contacted TWA or the Group Benefit Plans to determine to what medical benefits he and Mrs. Coker were entitled. (*Id.* at 24, 25, 31, 33, 35–37.) He never inquired about his and Mrs. Coker's medical benefits because he and Mrs. Coker received the information regarding insurance coverage from TWA in November 1993, and again in 1994, and so assumed that they were covered. (*Id.* at 31–37.) Mr. Coker made this assumption even though he knew that his TWA benefits ended in September 1993; that he had not received a COBRA information package from TWA; and that he had to pay a premium for COBRA coverage yet was not paying one. (*Id.* at 32–37.) Mr. Coker simply believed after receiving the November 1993 insurance information from TWA that he and Mrs. Coker were covered by TWA's medical benefits plan. (*Id.* at 36.)

Given all of the other knowledge and information sources that Mr. Coker possessed that contradicted his belief, his blind reliance on the insurance information sent by TWA was eminently unreasonable. Because plaintiffs' assumption that they were eligible for TWA or COBRA benefits was crucial to their decision regarding medical insurance for Mrs. Coker, and because of Mrs. Coker's chronic health problems, plaintiffs could have and should have determined whether their assumption that they were covered by insurance was correct. *See Krawczyk,* 41 F.3d at 280 (plaintiff should have asked whether his interpretation of a term in his retirement benefit plan was correct where the interpretation of the term was crucial to his retirement decision). Moreover, common sense should have indicated to plaintiffs that their understanding of their benefits—that they continued to be eligible for TWA or COBRA coverage several years after Mr. Coker was furloughed and without paying premiums for COBRA—was too good to be true. *See id.* (plaintiff's interpretation of term in benefit plan was too good to be true).

Instead, plaintiffs now attempt to place responsibility entirely on defendants for their own fault in not verifying what their medical benefits actually were. TWA's error in continuing coverage for plaintiffs does not excuse plaintiffs from taking responsibility for knowing the terms of their insurance coverage. That plaintiffs did not do so but relied only on the fact that TWA continued to provide medical benefits to them was unreasonable.

Accordingly, the court finds that no question of fact exists regarding whether plaintiffs reasonably relied on defendants' alleged misrepresentations—they did not.

### III. CONCLUSION

For the foregoing reasons, the court grants TWA's and the Group Benefit Plans'

motion for summary judgment and enters judgment against plaintiffs and in favor of TWA and the Group Benefit Plans on Count I; and dismisses with prejudice Count I against the Retirement Plan and the Retirement Plan as a party defendant.